# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 03-2518

_____

United States of America,                     *
                                              *
            Plaintiff-Appellee,               *
                                              *
      v.                                      *
                                              *
Dwayne Travoy Dillard,                        *
                                              *
            Defendant - Appellant.            *
                                              *
                                              *   Appeals from the United States
_____                                   *   District Court for the District
                                              *   of Minnesota.
No. 03-2519                                    *
_____                                   *
                                              *
United States of America,                     *
                                              *
            Plaintiff - Appellee,             *
                                              *
      v.                                      *
                                              *
Ashley Nehemiah Scaife,                       *
                                              *
            Defendant - Appellant.            *

_____

Submitted: March 10, 2004
Filed: June 7, 2004

_____

Before MURPHY, HEANEY, and SMITH, Circuit Judges.
_____

MURPHY, Circuit Judge.

Dwayne Travoy Dillard and Ashley Nehemiah Scaife pled guilty to conspiracy to distribute in excess of fifty grams of crack cocaine in violation of 21 U.S.C. §§ 841 and 846. Before sentencing the district court[1] held an evidentiary hearing at which police officers and coconspirators testified, and exhibits were received including grand jury testimony and police reports. The district court made findings and then applied sentencing enhancements to both defendants for possession of a dangerous weapon and for obstruction of justice and an additional enhancement to Dillard for playing a leadership role. Dillard was sentenced to 235 months imprisonment and Scaife to 188 months, and both appeal their sentences. We affirm.

The sentencing hearing produced evidence that Dwayne Dillard, his cousin Ashley Scaife, Domenique Cary, Charles Griffin, Cedric Shepard, Deandre Hill, and Prezont Martin sold crack cocaine in north Minneapolis. Testimony showed that they belonged to the Gangster Disciples, a multistate street gang often involved in drug distribution. The district court found that Dillard facilitated his group's drug business in Minneapolis by supplying the majority of the crack cocaine it sold.[2] Group members would introduce friends and relatives interested in becoming dealers to Dillard, who would then supply them with crack cocaine for distribution.

Dillard met Prezont Martin, a member of the Indiana Gangster Disciples, at Glen Mills Schools, a residential school in Pennsylvania for young men referred by

_____

[1]The Honorable Michael J. Davis, United States District Judge for the District of Minnesota.

[2]Cary had a separate drug source from which he would also occasionally supply members.

the courts. After their release from Glen Mills, Dillard supplied crack to Prezont for sale in Minneapolis. Prezont introduced Dillard to his cousin, Damian Walker, and Dillard also began supplying Walker with crack for further distribution.

On the morning of August 30, 2001, members of the Anoka-Hennepin County Violent Crime Task Force arrested Damian Walker for possession of crack cocaine in Brooklyn Park, Minnesota. After his arrest, the officers asked Walker if he would participate in an investigation of his source. Although he expressed concern about his personal safety, Walker agreed to cooperate with the officers by arranging a crack purchase from Dillard.

Later that evening under police supervision, Walker called Dillard and arranged to purchase two ounces of crack from him at a designated location in north Minneapolis. Walker and the officers went to the location, and Dillard arrived with Charles Griffin. The police intercepted them before the sale could occur. Dillard and Griffin were arrested, searched, and each found to possess one ounce of crack. They were taken to jail, and Walker was dropped off at another location by one of the officers.

At the Hennepin County Jail, Dillard was placed in a holding cell with Marques Martin, Walker's cousin, who had been arrested a few days earlier. On his first night in jail, Dillard told Marques, "your cousin snitched me off, he's got to go." Marques, unaware of his cousin's actions, denied that Walker had snitched on Dillard, and Dillard responded, "Man, that's how motherfuckers get killed . . . man that's how motherfuckers go." Police records indicate that Dillard made at least one phone call from the jail to fellow gang member Domenique Cary.

The next day, on August 31, 2001, Cedric Shepard, another member of the group called Marques' brother, Prezont Martin, and asked him to go along to pick up his car which had been impounded by the police. At this point, Prezont did not know

that his cousin Damian Walker had cooperated with the police in the controlled buy from Dillard. He willingly went with Shepard whose car was being held in Prezont's name. A group of men, including Scaife, Cary, and Deandre Hill, met Shepard and Prezont at the impound lot. They confronted Prezont, and Scaife accused him of being responsible for Dillard's arrest because he had introduced Dillard to Walker. After they attacked Prezont, beating and kicking him to the ground, Cary pointed a gun at him, forced him into a car, and ordered him to take them to Walker. Prezont directed the group to Walker's residence in Brooklyn Park, but Walker was not there when they arrived.

After Walker called Prezont's cell phone, the group located him at the home of Prezont's parents at 710 Newton Avenue North, Minneapolis. When they arrived at the house, Scaife yelled for Walker to come out and talk to him. Walker came to the door, and Scaife yelled, "Nigga, you snitched on my cousin" and tried to grab him. Walker ran inside and escaped by jumping out a second story window. After this incident, Walker contacted Detective Straunch, with whom he had worked on the Dillard investigation. Walker reported that he had been jumped by the gang and escaped, but that he feared that Dillard planned to kill him and had already put out an order on his life.

On September 4, 2001, Dillard was released from jail, and three days later, he arranged to meet the Martin brothers (Prezont and Marques) at a Kentucky Fried Chicken (KFC) restaurant in north Minneapolis. Prezont and Marques met Dillard, Scaife, and Hill in the KFC parking lot. Dillard complained to Prezont that, "Your cousin set me up. You introduced us, it's your fault." He repeatedly said that Prezont needed to "take care of it," and added that, "people get killed for doing shit like this, snitching on me."

Later that day, Prezont and Marques saw Dillard, Scaife, and Hill waiting in a vehicle outside their home. When the two brothers left the house and got in their

-4-

car, Scaife pulled along side, waived a handgun, and said, "don't take us by [Walker], cause I'll air him out on sight."

On September 22, 2001, Walker was shot and killed while sitting in the driver seat of a vehicle parked in front of a house at 2802 Colfax Avenue North in Minneapolis. Shortly after his cousin's death, Marques went to the police and reported that Dillard had made several threats on Walker's life. Marques identified Dillard and Scaife in police lineups, and the police used jail records to corroborate his story.

After Marques' interview with the police about Walker's death, Scaife confronted him on October 3, 2001 as he was leaving his mother's house. Scaife warned Marques that "You better make my name taste like shit in your mouth or it's going to taste like that when you are dead." Marques contacted the police about the threats and told them that Scaife had also threatened him in front of his mother, Ethel Walker, on another occasion. Marques explained that Scaife had told him, "Don't be telling people I killed Damian Walker because I didn't do it." The police later interviewed Ethel Walker, and she confirmed that she overheard Scaife telling Marques not to tell people on the street that he killed Walker.

On October 23, 2001, police arrested Scaife for tampering with a witness. Police interviewed Scaife at that time, and his statements corroborated those made by the Martin brothers. Scaife admitted that he thought Walker had set up Dillard. He acknowledged that he beat up Prezont at the impound lot and that Cary had had a gun there.

Dillard, Scaife, Cary, and Tachara Monique Fallon were indicted on November 20, 2001. Dillard and Scaife were charged with conspiracy to distribute in excess of fifty grams of crack cocaine and conspiracy to distribute in excess of 5,000 grams of crack cocaine, in violation of 21 U.S.C. §§ 841 and 846; aiding and abetting witness

-5-

tampering, in violation of 18 U.S.C. § 1512(b); and tampering with a witness, victim, or informant, in violation of 18 U.S.C. § 1512(b). Dillard was also indicted for aiding and abetting the possession and distribution of crack cocaine and possession with intent to distribute in excess of five grams of crack cocaine, in violation of 21 U.S.C. § 841. On March 5, 2002, Dillard and Scaife pled guilty under a plea agreement to conspiring to distribute in excess of fifty grams of crack cocaine, and the other charges against them were dismissed.[3]

The district court issued written findings based on the evidence produced at the hearing and sentenced Dillard to 235 months imprisonment after applying a two level enhancement for possession of a dangerous weapon under United States Sentencing Guidelines [U.S.S.G.] § 2D1.1(b)(1), a two level enhancement for obstruction of justice under § 3C1.1, and a two level enhancement for a leadership role under § 3B1.1(c). The district court denied Dillard's request for an adjustment for acceptance of responsibility under § 3E1.1, found that he did not qualify for the safety valve under § 5C1.2, and sentenced him at the low end of the guideline range.

Based on its written findings from the evidentiary hearing, the district court sentenced Scaife to 188 months after applying a two level enhancement for possession of a dangerous weapon under § 2D1.1(b)(1) and a two level enhancement for obstruction of justice under § 3C1.1. The district court found that Scaife was not entitled to an adjustment for acceptance of responsibility under § 3E1.1 and did not qualify for the safety valve under § 5C1.2. It sentenced him at the low end of the guideline range.

On appeal, Dillard and Scaife challenge their sentencing enhancements for possession of a gun and obstruction of justice. Dillard also challenges the enhancement for his role in the offense. A district court's application of the

---

[3]The other defendants charged in the indictment also pled at this time.

guidelines to the facts is reviewed de novo and its factual findings for clear error. United States v. Willey, 350 F.3d 736, 738 (8th Cir. 2003).

Dillard and Scaife argue that the district court erred in enhancing each of their offense levels by two points for possession of a firearm under U.S.S.G. § 2D1.1(b)(1). Dillard argues that he was in jail during the incident at the impound lot when Cary pointed a gun at Prezont and that he did not know that Scaife had a weapon when they drove by the Martin house. Scaife contends that the government did not prove his possession of a firearm in connection with his encounter with the Martin brothers in their car because no gun was ever found which could be connected with it.

Section 2D1.1(b)(1) provides for a two level enhancement for possession of a dangerous weapon "unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1 at cmt. n.3. The government has to show by a preponderance of the evidence that a firearm was present and that it was probably connected to the drug offense. United States v. Atkins, 250 F.3d 1203, 1213 (8th Cir. 2001). Proof of use or actual possession is not required for an enhancement because constructive possession is sufficient. Id. at 1213-14.

The district court did not err in enhancing both sentences for possession of a firearm. Scaife admitted when he was questioned by the police that Cary had a gun during their stop at the impound lot. He acknowledged that they used the gun to kidnap and intimidate Prezont because they believed he was responsible for Dillard's arrest. There was also evidence that Scaife waived a gun and threatened Prezont and Marques in a driveby near their house. The fact that this second gun was never recovered is immaterial because the testimony of the Martins was sufficient to establish Scaife's possession of a firearm. Id. Their testimony that Dillard was with Scaife when he used the gun to threaten them was also enough to show that Dillard had constructive possession of the firearm. Id. at 1214. The display of both firearms was in furtherance of the drug conspiracy since the guns were used to discourage

cooperation with law enforcement and to intimidate the Martins. The evidence supported the findings that Scaife and Dillard possessed a firearm and that it was connected with their offense.

Appellants assert that the district court erred in applying a two point enhancement for obstruction of justice under U.S.S.G. § 3C1.1 and that they were entitled to an acceptance of responsibility adjustment under U.S.S.G. § 3E1.1. Dillard argues that he had nothing to do with the assault on Prezont at the impound lot because he was in jail at the time and that Prezont was not threatened or intimidated when he was at the KFC. He maintains that he should have received an adjustment for acceptance of responsibility because he pled guilty and cooperated during the presentence investigation. Scaife argues that he should not have received an enhancement for obstruction because he was not under investigation at the time of the assault at the impound lot or connected to Walker's controlled transaction with Dillard. He also contends that he should have received an adjustment for acceptance of responsibility because once he was investigated, he cooperated with the authorities and pled guilty.

A defendant's offense level will be increased two levels for obstruction of justice under § 3C1.1 if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense." U.S.S.G. § 3C1.1. A defendant's willful knowledge that he obstructed justice means that he either knew he was under investigation or had "a correct belief that an investigation [was] probably under way." United States v. Vaca, 289 F.3d 1046, 1049 (8th Cir. 2002) (citation omitted).

The district court found that Scaife and Dillard threatened Walker and the Martins several times after Dillard's arrest for drug possession. Testimony at the evidentiary hearing showed that the group did not tolerate informants and that the

threats made by Dillard and Scaife were consistent with the Gangster Disciples rule against informing. Prezont described this rule as "stitches for snitches" or "snitches in ditches." Threatening incidents implicating appellants occurred at the Hennepin County Jail, the impound lot, the KFC, and at the home of the Martins' mother before and after Walker's killing. Police records indicate that Dillard called Cary from the Hennepin County Jail shortly before the incident at the impound lot where Cary displayed a gun and Prezont was beaten. Scaife admitted to police that he and his associates went to the impound lot because Dillard had been arrested and Prezont was responsible. Once released from jail, Dillard arranged a meeting at the KFC to confront Prezont about his responsibility for the arrest and to prompt him to take care of Walker. There was evidence that Dillard and Scaife tried to silence Walker and intimidate his relatives by displaying firearms, yelling death threats, and beating them on a number of occasions.

Scaife relies on United States v. Stolba, 357 F.3d 850 (8th Cir. 2004), to argue that his enhancement was improper because he did not know that he was being investigated at the time of any obstructive conduct. The facts of this case are very different from Stolba, however, because there the defendant's obstructive behavior undisputedly occurred well before any investigation into his offenses. Id. at 851. Here, the investigation into the drug conspiracy began with the arrest of Damian Walker and his arranged sale with Dillard. Scaife was involved in the same conspiracy as Dillard and the evidence showed that the conspirators knew Dillard had been arrested. When questioned by police, Scaife admitted that he knew there was an ongoing investigation of the drug activities. This case is more like Vaca, where the court found that the defendant's attempt to silence an informant and intimidate others showed that he believed he was under investigation. 289 F.3d at 1049. The threatening actions by Scaife and other conspirators after Dillard was jailed for possession with intent to distribute support the finding that Scaife knew an investigation of their drug activities was underway. Id.

After studying the record, we conclude that the district court did not err in enhancing the sentences of Dillard and Scaife for obstruction of justice. Although Dillard and Scaife argue that the court should have granted them acceptance of responsibility adjustments since they pled guilty, their involvement in obstructing justice could be considered by the district court as evidence that they had not accepted responsibility for their criminal conduct. See U.S.S.G. § 3E1.1 cmt. n.4. We see no clear error in the district court's findings, and we conclude it did not err in denying credits for acceptance of responsibility in the circumstances of this case.

Dillard also argues that the district court erred in granting a two level enhancement based on his role in the offense because even if he was a gang leader, he was not a leader in the drug conspiracy. He contends that the government has not met its burden of showing that he was a leader in the offense and that the district court based its finding on his expensive car. He points out that the probation officer correctly characterized him as an average participant. Under U.S.S.G. § 3B1.1, a defendant's offense level can be increased by two levels if he was an organizer or leader of a criminal activity. For a leadership enhancement, a defendant must have at least directed or procured the aid of others. United States v. Encee, 256 F.3d 852, 854 (8th Cir. 2001).

The district court found that Dillard was a leader in the offense, that he was at the top of this particular Gangster Disciples group, and that he directed its activities, which included its crack cocaine distribution. These finding are not clearly erroneous and are supported by the record. Several witnesses, including Scaife, told police that Dillard supplied crack cocaine to other gang members for distribution. Scaife, Prezont, and Marques identified Dillard as being at the top of the gang's hierarchy, and Scaife explained that Dillard controlled the crack distribution by determining who he would hire to deal the drugs. Prezont's testimony corroborated this, for he testified that he introduced Walker to Dillard as a potential drug dealer. The inference could also be made from the evidence that Dillard procured the aid of other

-10-

gang members after he was arrested by informing them that Walker had set him up. The evidence suggests that the other gang members were acting either to protect Dillard or at his behest, in intimidating Walker and Prezont for breaking the code against informants. Scaife stated that they went to the impound lot because Dillard had been set up, that after the KFC incident he knew Walker would die, and that it was Dillard's idea to have Walker killed. The district court did not err by enhancing Dillard's sentence two levels for his leadership role.

After our de novo review of the district court's application of the guidelines to factual findings supported by the record, we conclude that it did not err in enhancing appellants' sentences. We therefore affirm the judgments of the district court.

_____